IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

STARK AEROSPACE, INC. PLAINTIFF

v. CIVIL ACTION NO. 1:24-CV-102-SA

A&B FOUNDRY, LLC DEFENDANT

MEMORANDUM OPINION

On May 31, 2024, Stark Aerospace initiated this litigation by filing its Complaint [1] against A&B Foundry. Stark later filed an Amended Complaint [6], wherein it asserts claims for breach of contract and unjust enrichment.

On February 23, 2026, the Court held a one-day bench trial. During the trial, Stark called one witness—Mitchell Carter. A&B also called one witness—Vikas Sahni.

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the following constitutes the Court's findings of fact and conclusions of law:

*Findings of Fact*

1. Stark is a Delaware corporation with its principal place of business located in Columbus, Mississippi.
2. A&B is an Ohio LLC with its principal place of business located in Franklin, Ohio. A&B is a sole-member LLC with one individual member, Vikas Sanhi.
3. Stark is an aerospace defense manufacturing company. A&B is a casting company.
4. Generally speaking, in 2023, Stark and A&B entered into an agreement pursuant to which A&B was to manufacture and produce ball screws to Stark so that Stark could implement the ball screws into an end product to be delivered to its customer.
5. Prior to 2023, Stark and A&B had never contracted with each other.

6. In the early part of 2023, an individual within Stark's procurement department identified A&B as a potential supplier for the ball screws.
7. Stark initiated contact with A&B and later submitted to A&B the design requirements for the ball screw.
8. In response, A&B submitted a Quote to Stark. The Quote is dated May 16, 2023. The Quote listed a unit price of $2,850.00 for the first 5 exemplar ball screws and a unit price of $812.00 for the remaining 217 ball screws, constituting a total of 222 ball screws at a total price of $190,454.00.
9. The Quote also contains three pages of standard terms and conditions.
10. Stark responded to the Quote with a Purchase Order dated May 17, 2023. The Purchase Order contains 15 pages of standard terms and conditions.
11. A&B then submitted to Stark an Invoice dated May 23, 2023. The Invoice is a one-page document but states that "[a]ll orders are subject to A&B Terms and Conditions which are available upon Request." [42], Ex. 1 at p. 23.
12. Although the parties' corresponding submissions contained boilerplate terms and conditions that did not necessarily align with each other, the parties did not address the issue and simply proceeded with performance.
13. To provide some additional context, according to the Purchase Order, the first 5 exemplar ball screws were to be delivered to Stark on or before September 4, 2023. These exemplar products would be subjected to inspection (referred to as a First Article Inspection) so that Stark could confirm that the products comply with the design requirements.
14. On May 30, 2023, consistent with the Invoice, Stark paid A&B $95,227.00, which constituted 50% of the total purchase price.

15. After the deposit was paid, the parties had weekly or bi-weekly status meetings to discuss A&B's progress in manufacturing the ball screws. According to Mitchell Carter, who serves as Stark's Director of Program Management, as these status meetings progressed, Stark became increasingly concerned about A&B's ability to fulfill its contractual obligations.

16. Carter testified that Stark ultimately reached the conclusion that A&B would not be able to fulfill its obligations to produce the ball screws and therefore terminated the contract. Specifically, he testified that the order was cancelled because of Stark's lack of confidence that A&B could manufacture and test the part per the design requirements.

17. Stark verbally notified A&B of its unilateral termination of the contract via a Microsoft Teams meeting on July 26, 2023.

18. After terminating the agreement, Stark requested from A&B a refund of its deposit.

19. The parties held a meeting on October 13, 2023 to discuss the refund. Between Stark's cancellation of the contract on July 26, 2023 and the October 13, 2023 meeting, A&B submitted to Stark a PowerPoint presentation that A&B contends illustrates the work that had been done and costs that had been incurred in connection with the project.

20. Ultimately, citing the work and costs it had incurred in conjunction with project, A&B declined to issue a refund.

21. After the A&B contract was cancelled, Stark essentially restarted the procurement process and located a new supplier.

22. On May 31, 2024, Stark filed this lawsuit. Stark is pursuing claims for breach of contract and unjust enrichment. It requests a return of the $95,227.00 deposit as well as $37,893.25, which represents the additional costs incurred in connection with the new supplier.

*Conclusions of Law*

At the outset, considering that the parties submitted competing forms to each other and never memorialized a singular contract governing their relationship, the Court must determine whether a contract exists and, if so, its terms.

While the Court recognizes that the Quote contains a choice-of-law provision in favor of Ohio law and the Purchase Order indicates that New York law is applicable, the Fifth Circuit has made clear that "[a] federal court sitting in diversity must apply the choice-of-law rules of the state in which it sits." *Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620 (5th Cir. 2014). Thus, the Court will apply Mississippi law to analyze the existence of a contract between the parties and the terms thereof.

Section 75-2-206 of the Mississippi Code addresses contract formation. It provides in pertinent part:

> (1) Unless otherwise unambiguously indicated by the language or circumstances
>
> (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances[.]

MISS. CODE ANN. § 75-2-206.

The following section of the Code addresses the so-called "battle of the forms" issue and provides as follows:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code.

*Id*. at § 75-2-207.

Here, A&B's Quote, which it sent to Stark and which provided a proposed price and numerous terms and conditions, was the first document exchanged between the parties. It specifically addressed the manner in which it could be accepted:

> Acceptance by Purchaser of A&B Foundry, Machining, and Fabrications's Quotation shall be in writing and/or Purchase Order. The power of Purchaser to accept the Quotation is expressly limited to the terms of the Quotation, and any attempt to alter, omit, or add any term shall be deemed a rejection and a counteroffer. If Purchaser's form is used to accept the Quotation or is used as a supplement to the quotation form, it is expressly understood and agreed that the General Conditions of All Quotations and Sales set forth in the Quotation Form shall prevail insofar as the terms or conditions of Purchaser's form may in any way conflict with or be an addition to the General Conditions of All Quotations and Sales set forth in this form. The issuance of such order by Purchaser shall be deemed to incorporate by reference the General Conditions of All Quotations and Sales set forth and shall constitute Purchaser's agreement to them.

[42], Ex. 1 at p. 21-22.

As noted previously, the very next day, Stark submitted a Purchase Order to A&B. The Purchase Order referenced the quoted prices listed in A&B's Quote and included fifteen pages of "general purchase order terms and conditions." [42], Ex. 1 at p. 4. Section 2 of the Purchase Order, entitled "Preamble," provides in pertinent part:

> 2.1 This Order contains the entire Order between the Purchaser [Stark] and the Supplier [A&B] with respect to the subject matter hereof and is not subject to variation, irrespective of the wording of the Supplier's acceptance, without the prior written Order by the Purchaser. Any additional or different terms of the Supplier's acceptance are hereby expressly rejected. This Order becomes a binding Order including all terms and conditions contained herein and/or contained in documents incorporated into this Order, when it is accepted by the Supplier, either by acknowledgment in writing or the commencement of performance hereof.

*Id*.

Applying the statutory language, A&B's Quote constituted "an offer to make a contract" which "invit[ed] acceptance by any manner and by any medium reasonable in the circumstances." MISS. CODE ANN. § 75-2-206(1)(a). Stark's Purchase Order was a definite expression of acceptance sent within a reasonable amount of time. Therefore, under Section 75-2-207(1), the Purchase Order "operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." *Id*. at § 75-2-207(1). While the Purchase Order included broad language, it did not expressly make Stark's acceptance conditional on A&B's assent to any additional or different terms. Thus, applying the plain language of Section 207(1), the parties were in a contractual relationship.

To determine the terms of that contract, the Court turns to subsection (2). Applying it, the terms of the original Quote constitute terms of the contract. And the Purchase Order's *additional* terms became part of the contract. Here, the reality is that there are relatively minimal conflicting terms between the Quote and the Purchase Order. In fact, the bulk of the relevant terms regarding termination of the contract are contained within the Purchase Order. But they are additional terms that are part of the parties' contract by operation of Section 207(2).

With that being said, the Quote contains a choice of law clause in favor of Ohio law. Because the Quote was the original offer that Stark accepted, the Court will apply Ohio law—despite the fact that the Purchase Order contemplated New York law being applicable. *See id*. at § 75-2-206; 75-2-207(1).

Having resolved that issue, the Court reverts to the Amended Complaint [6]. Stark contends that A&B breached the contract by failing to perform. At trial, Carter testified that during weekly or bi-weekly status conferences with A&B after delivery of the deposit, Stark developed concerns that A&B was not capable of completing the required tasks and that A&B was not completing work on the project in order to meet the upcoming September 4, 2023 deadline for production of the five exemplar units. On July 26, 2023, multiple Stark employees, during a virtual Microsoft Teams meeting, advised Vikas Sanhi, the President of A&B, that Stark was terminating the contract. According to Carter, the contract was cancelled "because of [Stark's] lack of confidence that A&B could manufacture and test this part per the design."

The Quote provides little guidance as to changes or cancellation of the contract:

> No changes in or cancellations of orders shall be effective unless proposed in writing to, and accepted in writing by, A&B Foundry, Machining, and Fabrications. Any work done or costs incurred by A&B Foundry, Machining, and Fabrications prior to acceptance of such change or cancellation shall be paid by Purchaser.

[42], Ex. 1 at p. 21.

Although containing this general language regarding changes and cancellations, the Quote does not address termination for default and/or termination for convenience.

The Court therefore looks to the additional terms contained in the Purchase Order, which permitted Stark to terminate for default under certain circumstances, specifically providing:

> 22.1 Purchaser may terminate for default all or any portion of this Order in the event Supplier:

> 1) Fails to comply with the delivery schedule and/or any other schedule prescribed in this Order,
>
> 2) Fails to comply with any other term or condition of this Order,
>
> 3) Fails to progress with the work under this Order placing performance of this Order at risk, and, in such circumstances, Supplier does not cure such failure within fifteen (15) days (or such longer period as the parties may agree in writing) after receipt of Purchaser's notice of default specifying such failure[.]

[42], Ex. 1 at p. 11.

While termination for default is clearly authorized, the problem Stark faces is that none of the three specific scenarios are applicable here. First, Stark does not even contend that A&B failed to comply with a delivery schedule. Stark cancelled the order *prior* to the September 4, 2023 delivery date—thus, it cannot be the case that A&B failed to timely delivery the product. And, on cross-examination, Carter admitted that the Purchase Order contained no written milestones prior to September 4, 2023. As to the second subsection, when questioned about the precise contractual provision that A&B defaulted on, Carter answered, "I can't say" and later admitted that "I can't say that they failed anything at that time." These admissions undercut Stark's position. The third option for termination for default authorized Stark to terminate the contract if A&B failed to progress with the work to the point that it placed performance at risk. However, the subsection contemplates a notice of default and opportunity to cure. Carter's admissions during the trial make clear to this Court that this subsection, too, is inapplicable, as Stark indisputably did not issue a notice of default or provide an opportunity to cure.

Since none of the three options for termination for default are applicable, the Court concludes that particular provision does not provide a remedy for Stark.

Another provision of the Purchase Order that could potentially justify Stark's termination is Section 23, which is entitled "Termination for Convenience." In pertinent part, that provision states:

> 23.1 The Purchaser, by means of a written termination notice, may terminate this Order in whole or any portion thereof, for its convenience. Immediately upon receipt of such a termination notice, Supplier shall (as otherwise directed by Purchaser in writing):
>
> (a) Stop work on the portion of the Order to be terminated;
>
> (b) Cancel its subcontracts and purchase orders relating to the portion of the Order to be terminated;
>
> (c) Take all action as may be necessary to minimize the cost of termination;
>
> (d) Return to the Purchaser any property and data of the Purchaser in Supplier's possession, and
>
> (e) Transfer to the Purchaser completed or partially completed Products, if directed by the Purchaser.

*Id*. at p. 12.

Any reliance on this provision to support Stark's termination of the agreement is a non-starter from the outset because, again, there is no proof whatsoever that Stark provided A&B with any written notice. Carter admitted as much.

Ultimately, there is no proof in the record that Stark complied with the terms of its own Purchase Order to cancel the agreement. *See*, *e.g.*, *Slak v. Strozier*, 234 N.E. 3d 1144, 1151 (Ohio Ct. App. 2024) ("If the contract language is clear and unambiguous, a court must enforce the terms as written, without turning to evidence beyond the four corners of the agreement.").[1] Thus, the Court finds that Stark cannot prevail on its breach of contract claim.

[1] Although the Court cites Ohio law for this proposition, the outcome would be the same under New York law. *See*, *e.g.*, *Geothermal Energy Corp. v. Caithness Corp.*, 34 A.D. 3d 420, 423-24 (N.Y. App. Div. 2006).

But, despite Stark's failure to comply with the terms of the Purchase Order, it is undisputed that A&B was, through oral conversations, made aware of Stark's desire to terminate the agreement. Sanhi admitted that he was aware of Stark's desire in that regard. The same is also supported by the facts since A&B did not produce the ball screws to Stark.

Although Stark's failure to comply with the terms of the agreement's terms as to termination precludes recovery to some extent, the Court is left with the fact that A&B did not produce the ball screws in accordance with the parties' initial agreement yet A&B did not return any of the deposit money Stark paid to it. Although A&B contends that it had expended those funds and incurred costs in performance of the contract before Stark's improper cancellation, the Court was presented with little to no evidence to substantiate that point during the trial of this matter. The failure to present such evidence has left this Court in a precarious position as it simply cannot determine an appropriate resolution of that issue.

Consequently, rather than issue a decision unsupported by facts, the Court will order that the parties make additional submissions. Specifically, the parties are directed, within 21 days of today's date, to file a Memorandum setting forth their respective positions as to the funds and efforts expended by A&B in connection with this project and Stark's alleged entitlement to a refund to all or some portion of the deposit it paid to A&B. These submissions should include all legal arguments that the parties desire to make on this point, as well as any evidentiary submissions that the parties desire for the Court to consider. If the parties desire to do so, they may file a Response to the opposing party's Memorandum within 14 days after the initial submissions are made.

*Conclusion*

The Court will not dispose of this case at this time. The parties shall submit additional filings in accordance with the directives set forth herein.

SO ORDERED, this the 24th day of September, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE